# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

_____

**No. ACM 39321**

_____

**UNITED STATES**
*Appellee*

**v.**

**Michael A. GANS**[1]

Staff Sergeant (E-5), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary
Decided 11 April 2019

_____

*Military Judge:* John C. Harwood.

*Approved sentence:* Dishonorable discharge, confinement for 20 months, and reduction to E-1. Sentence adjudged 6 May 2017 by GCM convened at Peterson Air Force Base, Colorado.

*For Appellant:* Major Meghan R. Glines-Barney, USAF.

*For Appellee:* Lieutenant Colonel Joseph Kubler, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, HUYGEN, and POSCH *Appellate Military Judges*.

Chief Judge MAYBERRY delivered the opinion of the court, in which Senior Judge HUYGEN and Judge POSCH joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

_____

[1] While the Appellant's name included the suffix Jr. when docketed, nothing contained in the record of trial identifies Appellant's name as a Jr.

MAYBERRY, Chief Judge:

Appellant was convicted by a panel consisting of officer and enlisted members, contrary to his plea, of one specification of sexual assault of Airman First Class (A1C) KB by penetrating her vulva with his penis without her consent. Appellant was found not guilty of one specification of sexual assault of A1C KB by penetrating her vulva with his finger without her consent, and one specification of sexual assult of A1C JL[2] by penetrating her vulva with his penis without her consent, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. Appellant's adjudged and approved sentence consisted of a dishonorable discharge, confinement for 20 months, and reduction to E-1.

Appellant originally asserted two assignments of error: (1) Appellant's conviction is legally and factually insufficient; and (2) trial counsel's sentencing argument was improper. Appellant filed a supplemental assignment of error asserting unreasonable delay of appellate review. We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

Appellant was a Security Forces (SF) member assigned to Yokota Air Base (AB), Japan, and lived off base. On the evening of 22 April 2016, a number of SF personnel went to an off-base bar for a going-away party for a male Senior Airman (SrA) TS. The Yokota AB policy required assigned military personnel to stop drinking alcohol at midnight, and all enlisted members in the grade of E-5 and below to be in a place of lodging by 0100 hours. A1C KB testified that while at the bar, A1C JL and Appellant were talking and flirting. A1C KB thought this was "weird" because she knew A1C JL had a boyfriend and Appellant was a non-commissioned officer (NCO) who had previously been on A1C JL's flight. As midnight approached, a number of military members at the bar began to leave, some taking a taxi back to the base approximately 30 minutes away. Appellant, SrA TS, A1C JL, and A1C KB took a taxi to Appellant's off-base home. After arriving at the house, SrA TS walked to a local convenience store to get food for the group and then returned to the house.

While SrA TS was at the store, A1C KB observed Appellant try to kiss A1C JL while she was sitting in a recliner chair. A1C KB asked A1C JL about the kiss, to which A1C JL replied "Yeah, I really need to talk to him about that."

---

[2] A1C JL married and changed her last name prior to trial, but this opinion uses her initials based on how her name appears on the charge sheet

A1C KB also testified that she discussed the kiss with SrA TS when he returned, who agreed it was "pretty weird."

SrA TS and A1C KB were to sleep on the floor in the guest room (it contained no furniture) and A1C JL and Appellant in Appellant's bedroom. Both bedrooms were on the second floor of the house. After SrA TS and A1C KB were in the guest room, A1C JL came into the room and chatted with them. A1C KB described A1C JL's demeanor during that conversation as "hesitant, on guard, like she felt awkward," and testified that she thought A1C JL felt uncomfortable being in the room with Appellant. A1C KB acknowledged that A1C JL never told her she did not want to be alone with Appellant or that she was uncomfortable being in Appellant's bedroom, but explained that A1C JL was not one to come out and say she was uncomfortable. A1C KB was not aware that A1C JL had previously gone to the off-base bar with Appellant and SrA TS multiple times, and was not aware that A1C JL had spent the night at Appellant's house on multiple occasions.

During the course of this conversation, SrA TS and A1C KB invited A1C JL to sleep in the guest room, but she declined. A1C KB testified that she ultimately decided to go into Appellant's room to sleep because of her sense that A1C JL was uncomfortable. Prior to going into Appellant's room, A1C JL and A1C KB walked downstairs and removed Appellant's clothes from his dryer to change into before going to sleep. A1C KB changed into one of Appellant's shirts, and A1C JL changed into a t-shirt and shorts before returning upstairs to Appellant's bedroom.

Once in Appellant's room, the three of them laid in the bed and watched a scary movie. Standing at the foot of the bed, A1C KB was on the left side, A1C JL was in the middle, and Appellant was on the right. A1C KB did not like the movie so she turned onto her right side, faced the wall, and fell asleep. The next thing A1C KB recalled was that Appellant was now in the middle of the bed and penetrating her vulva with his finger. A1C KB stated that Appellant "stopped as soon as [she] woke up so [she] didn't . . . really think much of it. [She] just hoped that maybe he wouldn't do it again." A1C KB further stated that while Appellant was digitally penetrating her, she heard Appellant having sexual intercourse with A1C JL. A1C KB was turned away and facing the wall the entire time, never looking behind her. A1C KB stated that she did not turn to look, and she did not get out of the bed because she was "kind of out of [her] mind" and "pretty drunk."

Sometime after Appellant removed his finger, Appellant "leaned over and whispered in [A1C KB's] ear, 'Do you want it?'" A1C KB repeatedly "shook [her] head 'no,'" but could not recall if she lifted her head off the pillow. Appellant then asked, "What?" and she repeatedly shook her head to indicate "no" a second time. A1C KB never said "no." At this point in time, A1C KB was still lying

on her right side, with her left leg bent at the knee on top of her right leg. After A1C KB shook her head "no" the second time, Appellant, who was behind her, pulled down her leggings and underwear and inserted his penis into her vulva.

A1C KB went on to testify that after a short period of time, she used her left hand to reach behind and push against Appellant, at which time he stopped penetrating her with his penis. Appellant then switched spots in the bed with A1C JL, again putting her in the middle. A1C KB was not certain whether A1C JL was awake or if Appellant moved A1C JL, and could not recall if she told investigators that Appellant may have whispered to A1C JL to switch spots with him. Very shortly thereafter, A1C KB left Appellant's bedroom and returned to the guest room where SrA TS was asleep. A1C KB's statements and trial testimony of what transpired at the bar and in Appellant's bedroom were virtually unrebutted.

SrA TS testified that he had been to the bar with Appellant and A1C JL on previous occasions, and he was aware that A1C JL had gone to Appellant's home after some of those occasions. SrA TS knew that Appellant offered his house for others to crash after drinking downtown. SrA TS testified that at no point that night did A1C JL say that she felt uncomfortable. Before A1C JL came into the guest room, SrA TS and A1C KB were discussing "the weirdness" of A1C JL being in the Appellant's bedroom and they both texted A1C JL to make sure she was ok. After sending those texts, A1C JL came into the guestroom and SrA TS sensed she was uncomfortable. After A1C KB and A1C JL left the room, SrA TS fell asleep. SrA TS testified he later woke up to A1C KB curled up in a ball, rocking and sobbing, and she seemed distraught. The two went downstairs where A1C KB said, "Appellant raped me" and so he decided they should leave the house as fast as possible.

SrA TS called his supervisor at approximately 0200. Although the supervisor lived in Appellant's neighborhood, SrA TS did not know where his supervisor lived, did not indicate that he had just left Appellant's house, and only described the general direction in which they were walking. This generic description caused the supervisor to drive around for some time; it was almost 0300 when he picked up SrA TS and A1C KB. He drove them back to Yokota AB where A1C KB reported the incident to SF. The supervisor testified that he had seen A1C JL at Appellant's home on a few occasions in the past helping take groceries out of the car, and she would speak to him on those occasions.

After A1C KB informed SF personnel she had been raped, she went to the Sexual Assault Prevention and Response office and then to the Air Force Office of Special Investigations (AFOSI), reporting the sexual assaults. Later that morning she submitted to a sexual assault forensic examination.

4

As a result of the reported crime, the SF Commander dispatched SF personnel to Appellant's house. They knocked and rang the bell for almost five minutes, and ultimately found the house was unlocked. The SF personnel entered and found both Appellant and A1C JL asleep in Appellant's bed. A1C JL came out of Appellant's room wearing a baggy t-shirt and baggy shorts, she went downstairs to retrieve her clothes and changed into them. She did not appear to be intoxicated. Both Appellant and A1C JL were then transported to the SF building on base. Later that same day, Appellant underwent a sexual assault forensic examination.

When questioned by SF and the AFOSI, A1C JL denied that anything happened to her at Appellant's house. After the initial interview, A1C JL spoke with A1C KB and learned that A1C KB had reported seeing Appellant and A1C JL having sex. Despite that, during A1C JL's second interview with AFOSI that same day, she again denied anything happened to her. Six days later, A1C JL returned to the AFOSI and reported that she had been sexually assaulted by Appellant on the night in question, but did not remember any details. At trial, when questioned by a court member as to how she knew she had been assaulted if she did not remember the details of that night and early morning, A1C JL stated that "she just connected the dots between AFOSI asking her questions about A1C KB," the fact that A1C KB told her to "get checked out" and "that's when I just assumed." While A1C JL admitted to staying at Appellant's house on several occasions, she steadfastly denied having a sexual or otherwise unprofessional relationship with him.

## II. DISCUSSION

### A. Legal and Factual Sufficiency of Sexual Assault of A1C KB

Appellant challenges the legal and factual sufficiency of his conviction for sexual assault, specifically challenging whether there was sufficient evidence of penetration of A1C KB's vulva by his penis, and, if there was, whether Appellant had a reasonable belief that A1C KB consented to sexual intercourse with Appellant. We disagree.

#### 1. Additional Facts

At trial, Ms. MC, a forensic biologist employed at the U.S. Army Criminal Investigations Laboratory, testified as an expert witness. Ms. MC testified that she performed deoxyribonucleic acid (DNA) analysis on a variety of samples. A sample from the waistband of A1C KB's underwear contained a mixture of DNA, which was identified to be consistent with originating from A1C KB, A1C JL, and Appellant. Ms. MC also found DNA profiles of three individuals on Appellant's underwear and penile swabs, also consistent with originating from A1C KB, A1C JL, and Appellant. Finally, Ms. MC found male DNA on A1C

KB's cervical, vaginal, and pubic mound swabs as well as the swab from the inside crotch of her underwear. These samples did not contain sufficient DNA to generate a usable DNA profile. Ms. MC testified that, as a general rule, male DNA would not be expected to be found on a cervical swab after two days. A1C KB testified that she had not engaged in any sexual activity within five days of the night in question.

### 2. Law

We review issues of legal and factual sufficiency de novo. Article 66, UCMJ, 10 U.S.C. § 866; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence presented at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements [of the crime] beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. We apply "neither a presumption of innocence nor a presumption of guilt" but "assess the evidence in the entire record . . . [to] make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Id.* "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

As charged, the Government had to prove beyond a reasonable doubt that Appellant committed a sexual act upon A1C KB by causing penetration, however slight, of her vulva with his penis, and that Appellant caused bodily harm to A1C KB by such penetration. *See Manual for Courts-Martial, United States,* pt. IV, ¶ 45b(3)(b) (2016 ed.). "The term 'bodily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act . . . ." Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3) (2016). With regard to consent, the statute provides, "'[C]onsent' means a freely given agreement to the

conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the [appellant]'s use of force . . . does not constitute consent." Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 920(g)(8)(A). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." Article 120(g)(8)(C), UCMJ, 10 U.S.C. § 920(g)(8)(C).

### 3. Analysis

The details of the events that occurred on the night of 22 April 2016 between Appellant, A1C JL, and A1C KB are somewhat muddled but the basic facts are clear. Sexual activity occurred between Appellant and A1C JL as well as between Appellant and A1C KB. There was only one occupant in that bed with a penis. The presence of male DNA inside A1C KB's vagina together with the presence of A1C KB's DNA on Appellant's penis corroborate her testimony that Appellant penetrated her vulva with his penis. Viewing the evidence in the light most favorable to the prosecution, we conclude that a reasonable factfinder could have found Appellant guilty beyond a reasonable doubt of penile penetration of A1C KB. We are ourselves convinced beyond a reasonable doubt that Appellant penetrated A1C KB's vulva with his penis. We now turn to Appellant's assertion that the sex with A1C KB was consensual.

While the trial defense counsel cross-examined A1C KB as to what happened and argued that it was not unreasonable for two people who had just met to engage in consensual sexual activity, we conclude that a reasonable factfinder could have found that A1C KB did not consent to sexual intercourse with Appellant. A1C KB was a junior Airman and did not know Appellant well. She had only been at Yokota AB for a short time, had just completed technical training, and was at her first duty assignment. She only went to the going-away party because A1C JL and others she knew were going. A1C JL had been her sponsor, and she knew that A1C JL was in a relationship with another member of the squadron. Observing Appellant's overt flirting with A1C JL during the course of the night, A1C KB was concerned. A1C KB had no knowledge of any ongoing relationship between Appellant and A1C JL. We too conclude that A1C KB did not consent to having sexual intercourse with Appellant, which leaves only the issue of whether Appellant mistakenly believed A1C KB consented.

If shown by some evidence, mistake of fact as to consent is a defense to sexual assault. The mistake of fact as to consent defense requires that an appellant, because of ignorance or mistake, incorrectly believe that another consented to the sexual contact. The military judge instructed the members as to

mistake of fact. In order to rely on a mistake of fact as to consent defense, Appellant's belief must be honest and reasonable. *See* R.C.M. 916(j)(1); *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting United States v. Willis, 41 M.J. 435, 438 (C.A.A.F 1995)). Based on the totality of evidence, we find it was neither. The facts establish that Appellant was the initiator to the conduct and disregarded A1C KB repeatedly shaking her head no. It was reasonable for the members to determine that Appellant could not have held a reasonably mistaken belief that she consented to the sexual act, as do we.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a reasonable factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of sexual assault by penile penetration of A1C KB. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced beyond a reasonable doubt of Appellant's guilt. We therefore find Appellant's conviction both legally and factually sufficient.

## B. Sentencing Argument

Appellant alleges trial counsel's sentencing argument was improper for three reasons: (1) trial counsel improperly argued general deterrence; (2) trial counsel improperly commented that Appellant did not apologize to A1C KB in his unsworn statement; and (3) trial counsel improperly commented on A1C KB's unsworn victim impact statement.

### 1. Additional Facts

Trial counsel's sentencing argument included the following:

> At least seven years of confinement is required to deter both [Appellant] and others who might be contemplating committing a crime like this. At least seven years is required. It has to be enough to make him stop -- him who didn't know this was wrong -- and to make others stop; others who will hear of this crime. At least seven years. And it has to stop. Crimes like these have to stop. Because what will become of the Air Force if NCOs or anyone in leadership thought this was okay? What would become of the Air Force if airmen or future would-be airmen thought that the Air Force thought this was okay?
>
> . . .
>
> So consider what he says, but consider it for what it's worth. And consider his unsworn statement and what he said and that he's sorry now and that he's sorry to his command. But consider who he didn't say sorry to. He didn't say sorry to Airman [KB]. He didn't say sorry to her for what he did to her that night; for

> doing things that give her nightmares now and make her wake up in the middle of the night with night terrors. He didn't say sorry to her for the lifetime of suffering that she could now face; for doing this to her at the beginning of her Air Force career. Consequences of which we might never know how long she feels them. So consider when he says sorry but consider who he didn't say sorry to. At least seven years of confinement.

Trial defense counsel did not object at any time during trial counsel's argument. After all arguments were complete, trial defense counsel acknowledged that general deterrence was a legitimate factor for the members to consider but, based on the number of times trial counsel made reference to the members sending a message with the sentence, requested a special instruction to ensure that the members knew they should not increase what would otherwise be a just punishment solely to send a message.

The military judge made a finding that "trial counsel did not exclusively argue general deterrence but did focus on it heavily." Thus, the military judge gave the members an additional instruction:

> Trial counsel has presented argument in the form of argument based upon general deterrence. Deterrence of others is an acceptable objective of sentencing and it is one of the many acceptable objectives of sentencing and it is proper for your consideration. However, it is important that you remember as members of the court when considering deterrence that the most effective deterrent is the imposition of a fair and just sentence for the offense that the accused has been convicted of and not a sentence which is excessive to the offense charged.

Additionally, the military judge instructed the members regarding the unsworn statements of both Appellant and A1C KB, using the standard Military Judges' Benchbook language. Trial defense counsel did not object to the instructions.

**2. Law**

Improper argument is a question of law that we review de novo. *United States v. Pope*, 69 M.J. 328, 334 (C.A.A.F. 2011) (citation omitted). Because the trial defense counsel did not object to trial counsel's sentencing argument, we review Appellant's claim for plain error. *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007). To prevail, Appellant must prove that: "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (Citations omitted).

Our superior court in *United States v. Paxton* held that during sentencing argument a trial counsel may not comment upon an accused's exercise of his

or her constitutionally-protected rights to not testify or to plead not guilty. 64 M.J. 484, 486 (C.A.A.F. 2007) (citation omitted). The CAAF re-affirmed that an accused's refusal to admit guilt after findings may be an appropriate factor for consideration in sentencing deliberation on rehabilitation potential but only if a proper foundation has been laid. *Id.* at 487 (citing *United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992)).

The United States Court of Appeals for the Armed Forces explained that a proper foundation exists when "an accused has either testified or has made an unsworn statement and has either expressed no remorse or his expressions of remorse can be arguably construed as being shallow, artificial, or contrived." *Id.* at 355 (citations omitted). On this point, during sentencing argument the trial counsel is at liberty to "strike hard, but not foul, blows." United States v. Baer, 53 M.J. 235, 237 (C.A.A.F. 2000) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)); *Edwards*, 35 M.J. at 351.

Article 6b, UCMJ, 10 U.S.C. § 806b, and Rule for Courts-Martial (R.C.M.) 1001A expressly provide victims of sexual offenses the right to be reasonably heard at a sentencing hearing. Furthermore, R.C.M. 1001A(e) provides that a victim can make an unsworn statement.

### 3. Analysis

Trial counsel's argument focused largely on the confinement aspect of the sentence, and, while general deterrence was one of the factors offered in support of the requested sentence, trial counsel did not rely exclusively on this factor. Counsel also advocated for "punishment for punishment's sake" and rehabilitation, repeatedly arguing that Appellant needed significant confinement to understand what he did was wrong. In context, the argument did not exclude consideration of individualized sentencing, and there is nothing about the sentence that would support a finding that the reference to general deterrence improperly enhanced the adjudged sentence.

Appellant also asserts that trial counsel's reference to him not apologizing to A1C KB was improper. This was an assessment of the content of Appellant's apology in his unsworn statement. Trial counsel's strategy appears to have been to build off of the mandatory dishonorable discharge and focus the members' attention on other appropriate sentence components. Here, Appellant acknowledged that the members had found he committed a crime, apologized to the members and to his leadership but never mentioned A1C KB in his unsworn statement. As was the case in *Edwards*, the absence of any remorse toward A1C KB was a legitimate comment on Appellant's rehabilitative potential.

Lastly, Appellant asserts that trial counsel improperly included the content of A1C KB's unsworn victim impact statement in sentencing argument. Appellant's argument distorts the prohibition against "arguing facts not in evidence," relying on this court's decision in *United States v. Hamilton*, 77 M.J. 579, 585 (A.F. Ct. Crim. App. 2017) (en banc), *aff'd*, ___ M.J. ___, No. 18–0135, 2019 CAAF LEXIS 118 (C.A.A.F. 28 Feb. 2019), that held "victim impact statements offered pursuant to R.C.M. 1001A are not evidence." The right of a victim to be heard at sentencing expressly allows for an unsworn statement. The unsworn statement was marked as Court Exhibit 2 in accordance with R.C.M. 1001A (a), not as a prosecution exhibit. The military judge properly instructed the members that "an unsworn statement is an authorized means for a victim to bring information to the attention of the court and must be given appropriate consideration" and that "the weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member."

Although the CAAF decision in *Hamilton* rendered the granted issue of whether or not unsworn victim impact statements are evidence moot, it stated that

> in those cases where a military judge complies with the detailed parameters set forth in R.C.M. 1001A (2016) and exercises sound discretion in determining whether the "right to be reasonably heard" is exceeded, resolution of this issue is unlikely to be dispositive. Of course, to the extent that provisions of the Military Rules of Evidence contradict the crime victim's right to be "reasonably heard" under R.C.M. 1001A (2016), see, e.g., M.R.E. 603, the clear intent of Congress and the President dictate that the latter controls. See Article 6b, UCMJ.

*Hamilton*, 2019 CAAF LEXIS 118, at *17 & n.9.

Based on the military judge's compliance with R.C.M. 1001A and the victim's Article 6b, UCMJ, right to be reasonably heard, we find it was not improper for trial counsel to argue A1C KB's description of how Appellant's crime had adversely affected her as a factor the members should consider in determining an appropriate sentence.

In summary, trial counsel's reliance on general deterrence as well as the references to Appellant's failure to apologize to A1C KB and the content of A1C KB's unsworn statement was not error, plain or otherwise.

## C. Timeliness of Appellate Review

Appellant now asserts a supplemental assignment of error of untimely appellate review and requests that we disapprove the mandatory-minimum dishonorable discharge.

We review de novo whether an appellant has been denied the right to due process and a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citation omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before the court. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted).

Appellant's case was originally docketed with the court on 7 September 2017, and the opinion was not issued within 18 months. Despite the facially unreasonable delay, we find no violation of Appellant's right to due process. Appellant has not asserted prejudice and we find none. Finding no prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system and does not merit relief. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002).

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c) (2016). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court